UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ALFRED W. THOMAS,

      Plaintiff,

v.                                                                    Case No: 8:17-cv-2254-T-36CPT

WASTE PRO USA, INC. and WASTE PRO
OF FLORIDA, INC.,

      Defendants.
_____/

## **ORDER**

This matter comes before the Court on Defendant Waste Pro USA, Inc.'s Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 185), Plaintiff's response thereto (Doc. 206), Defendant Waste Pro USA Inc.'s reply (Doc. 215), Waste Pro of Florida, Inc.'s Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 187), Plaintiff's response thereto (Doc. 207), Defendant Waste Pro of Florida, Inc.'s reply (Doc. 218), Plaintiff's Amended Motion for Partial Summary Judgment and Incorporated Supporting Memorandum of Law (Doc. 197), Defendant Waste Pro USA, Inc.'s response thereto (Doc. 210), Defendant Waste Pro of Florida, Inc.'s response thereto (Doc. 211), and Plaintiff's reply (Doc. 221). Defendants both move for summary judgment and Plaintiff moves for partial summary judgment as to liability. Doc. 185, Doc. 187, Doc. 197.

The Court, having considered the motions, being duly advised in the premises and for reasons described herein, will deny Defendant Waste Pro USA, Inc.'s Motion for Summary Judgment (Doc. 185), will grant in part and deny in part Waste Pro of Florida, Inc.'s Motion for Summary Judgment (Doc. 187) and deny Plaintiff's Amended Motion for Partial Summary Judgment (Doc. 197).

# I.    BACKGROUND AND FACTS[1]

This is a collective action filed pursuant to § 216(b) of the FLSA by Plaintiff Alfred W. Thomas ("Thomas" or "Plaintiff") pertaining to the pay of certain "Helpers" employed by Defendants Waste Pro USA, Inc. ("Waste Pro USA" or "WP USA"), and Waste Pro of Florida, Inc. ("Waste Pro of Florida" or "WP Florida") (collectively, "Defendants"), which alleges willful violations of the FLSA.  Doc. 111 ¶¶ 1, 64, 72.  Waste Pro USA is the parent company to various subsidiaries who provide professional solid waste collection and disposal and recycling services in nine states pursuant to various commercial, municipal, subscription or military contracts.  *Id.* ¶ 23, Doc. 130 ¶ 23, Doc. 197-28 at 2; Doc. 213 ¶ 4.  One of those subsidiaries is Waste Pro of Florida.  Doc. 111 ¶ 23, Doc. 131 ¶ 23; Doc. 213 ¶ 4.

The Second Amended Complaint raises two causes of action:  (1) violation of the FLSA by Defendants, jointly and severally, by failing to pay Plaintiff and other Helpers time and a half overtime premium pay when they worked more than forty hours per week, and (2) violation of the FLSA by Waste Pro USA by failing to pay Plaintiff and other Helpers time and a half overtime premium pay when they work more than forty hours per week.  Doc. 111 ¶¶ 58-73.

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including depositions, interrogatory responses, declarations, and exhibits (Doc. 185-187; Doc. 197; Doc. 206-207, 209-211, Doc. 215-216, Doc. 218-219, Doc. 221), as well as the parties' Stipulation of Agreed Material Facts Regarding Defendants Waste Pro USA's Motion for Summary Judgment (Doc. 205), Amended Stipulation of Agreed Material Facts Regarding Defendant Waste Pro of Florida's Motion for Summary Judgment (Doc. 208), and Stipulation of Agreed Material Facts Regarding Plaintiff's Amended Motion for Partial Summary Judgment (Doc. 213).

### A. Undisputed Facts

#### 1. Company Structure

WP USA was founded by John J. Jennings, who is the Chairman of the Board and Chief Executive Officer ("CEO") of WP USA. Doc. 197-27 at 7:8-9; Doc. 197-30 at 2. Jennings is also the CEO of WP Florida. Doc. 206-1 at 3211-14. WP USA operates in nine states, including Florida, Georgia, North Carolina, South Carolina, Alabama, Mississippi, Louisiana, Arkansas, and Tennessee. Doc. 197-30 at 2. WP USA is "one of the largest, full-service, vertically integrated waste management companies." *Id.* at 3.

Regional Vice Presidents act as the CEOs of their area, but report to Jennings. Doc. 206-1 at 32:8-14. There are ten Regional Vice Presidents. Doc. 197-30. The CEO of WP USA hires Regional Vice Presidents and the decision to fire a Regional Vice President is made by Jennings or the Board of Directors of WP USA. Doc. 213 ¶¶ 8-9. Jennings meets with the Regional Vice Presidents roughly three times per year to discuss the status of the regions. *Id.* ¶ 13. Once every week, the Regional Vice Presidents conduct a conference call to discuss the needs and success of their regions. *Id.* ¶ 16.

Each subsidiary has its own Human Resources Manager. Doc. 205 ¶ 17. Some subsidiaries, including WP Florida, has a Human Resources Manager for each region. *Id.* ¶ 18.

WP Florida consists of five regions: southeast, central, north, southwest, and coastal. Doc. 205 ¶ 1. Each region is made up of divisions. *Id.* ¶ 3. Each region within WP Florida is managed by a Regional Vice President, and each division is managed by a Division Manager, who reports to the Regional Vice President. *Id.* ¶¶ 2, 4. Depending on the size of the division, there is also an Operations Manager or Site Manager who reports to the Division Manager and who oversees

Route Supervisors or Route Managers.  *Id.* ¶¶ 5, 6.  Helpers report to Route Supervisors or Route Managers.  *Id.* ¶ 7.

Division Managers have the authority to determine schedules for Helpers and staff the routes.  *Id.* ¶ 8.  The number of hours worked by a Helper each day depends on his or her assigned route.  *Id.* ¶ 11.  Additionally, Division Managers have the authority to train and evaluate Helpers, although WP USA provides guidelines related to training.  *Id.* ¶¶ 8, 16.  Because Helpers are laborers, most training occurs on the job, although Helpers receive limited classroom training.  *Id.* ¶¶ 13-14.

The rate of pay for Helpers varies among divisions and regions.  *Id.* ¶ 9.  Some divisions start all Helpers at the same pay rate, whereas others set Helpers' rates based on experience.  *Id.* ¶ 10.  WP USA maintains employees' 401(k)s and health insurance plans.  *Id.* ¶ 19.

WP USA and WP Florida are indisputably related to a certain extent.  Defendants urge in this proceeding that WP USA provides guidance and administrative support to its subsidiaries, including WP of Florida.  *See generally* Doc. 210.  Banasiak testified during his deposition with respect to various forms of support provided by WP USA, including human resources support as needed with respect to specific questions or issues (Doc. 206-1 at 58:19-59:12), provision of a timekeeping system, ADP (*Id.* at 62:11-63:5), and provision of an intranet site that hosts forms and data that can be used by the subsidiaries (*Id.* at 63:7-15).

WP USA also has a corporate safety department, accounting department, maintenance department, and sales department.  *Id.* at 66:7-16, 69:14-16.  The WP USA safety department provides information related to changes in safety information, such as changes in Department of Transportation regulations, via posting documents with such information on the intranet.  *Id.* at 70:19-22, 71:1-8.  The maintenance department is responsible for changes in equipment and

service for equipment. *Id.* at 72:15-16. For example, maintenance would advise of changes in how often oil should be changed for trucks. *Id.* at 72:15-23. The WP USA maintenance department has a record of the vehicles that are purchased by the regions. *Id.* at 73:25-74:9. The WP USA accounting department evaluates financial results and performance. *Id.* at 76:16-17. The financial results handled by the WP USA accounting department are generated by each region by a regional controller. *Id.* at 77:3-5. The WP USA sales department is a support mechanism for the field and does not generate any sales. *Id.* at 79:3-6.

Plaintiff argues that WP USA and its subsidiaries are a single enterprise and WP USA is a joint employer of the Helpers. *See generally* Doc. 197. Plaintiff relies on evidence that WP USA advertises itself as a waste removal company, like its subsidiaries (Doc. 197-30), and Jennings is on the Board of Directors of WP USA, is CEO of each subsidiary, and delegates management to the Regional Vice Presidents, some of whom oversee operations across several different subsidiaries (Doc. 197-24, Doc. 197-27 at 7:7-9, 17:14-18, Doc. 197-28 at 2). Additionally, payroll for the subsidiaries is handled locally, but managed by WP USA. Doc. 197-35. Moreover, the subsidiaries may use documents with the WP USA logo on them and, even if they have the power to change various documents, such as an employee handbook, Defendants present no evidence that any region actually made any changes. Doc. 197-41, Doc. 206-1 at 17-19, Doc. 206-14, Doc. 206-15, Doc. 206-16, Doc. 206-17. Plaintiff also relies on evidence that employees applied for Helper positions through the WP USA webpage, receive documents purportedly from WP USA, and understand themselves to be WP USA employees. Doc. 206-14 ¶¶ 5-8; Doc. 206-15 ¶¶ 1-7, Doc. 206-16 ¶¶ 1-6, Doc. 206-17 ¶¶ 1-5.

## 2.      Pay Methods

Helpers are employees who load garbage, recycling, or other solid waste into a rear-load truck.  Doc. 197-2; Doc. 206-1 at 30:22-31:1.  Helpers in WP Florida are paid a day rate, although the starting pay differs by division and is set by the division manager.  Doc. 206-1 at 181:21-183:9-14.  Most Helpers employed by WP USA subsidiaries are paid via the day rate method, although some are paid on an hourly basis.  Doc. 197-4.  A day rate is intended to compensate an employee for his or her work that day, regardless of the number of hours worked.  Doc. 197-1 at 8, Doc. 197-10 at 61:9-17.  More specifically, divisions have routes to collect solid waste, and Helpers have a daily task of picking up a route, and receive a day rate for picking up that daily task.  Doc. 206-1 at 91:12-19.  Additionally, Helpers also receive non-discretionary bonuses if they assist on other routes or meet the criteria for performance bonuses.  *Id.* at 95:24-96:2, Doc. 197-18; Doc. 213 ¶¶ 2-3.

With respect to half-day rates, these were paid by various WP USA subsidiaries, including WP Florida, until 2017.  Doc. 206-1 at 124:1-125:25.  The half day rate was not paid anywhere in WP Florida after August 24, 2017.  Doc. 186-1 ¶ 14.

Overtime for day rate workers in WP Florida is calculated by multiplying each hour worked over 40 hours by one-half of the workers' regular rate, which is calculated by dividing the total compensation by the total hours worked.  Doc. 197-1 at 9.  The workers' total compensation for the week includes their day rate, their half day rate, and non-discretionary bonuses.  Doc. 187 at 3.

## B.      Disputed Facts as to Pay Method

Regional Vice President for the West Coast of Florida, Keith Banasiak, testified during his deposition that the half day rate is "compensation for something less than what the daily task would

be." Doc. 206-1 at 124:1-6.  When asked whether it was triggered by hours, Banasiak stated that he would describe the half day rate as a task.  *Id.* at 126:5-11.  He further explained that "if an employee . . . has a set task to do, but" the helper is also asked to do something that was not "his normal daily task," such as coming in on a weekend to clean the yard, he would be paid the half day rate.  *Id.* at 126:11-17.

However, Plaintiff argues that Defendants have a common practice of paying the half day rate if Helpers work 4.0 hours or less in a day.  Doc. 197 at 11.  To support this assertion, Plaintiff cites to an e-mail from Judi Craigo, the Director of Benefits for WP USA (Doc. 197-29), to Tia Epps, a regional human resources representative for Georgia, North Carolina, and South Carolina, in response to Epps' question of "after how many hours a person has worked do we pa[y] them the FULL Day Rate?"  Doc. 197-13.  Craigo's response states "Less than 4 hours = ½ Day[;] 4 hours or more = 1 Full Day."  *Id.*  Plaintiff also relies on an e-mail exchange between Craigo, Shannon Early, who is the Director of Human Resources for WP USA, and Trish Reid, who is a human resources manager for the "Southern Region of WastePro USA."  Doc. 197-14.  The exchange concerns how to explain the overtime rate for a day rate employee.  *Id.*  In the exchange, Reid states that she is hesitant to use a supplied spreadsheet because employees did "not understand it" and it shows that a specific employee was being paid a low overtime rate.  *Id.* at 2.  Reid suggests explaining the overtime rate by stating, in relevant part, that day rate employees "are not paid time and a half like hourly employees are because [day rate employees] earn a day rate for the day.  As long as [day rate employees] work at least 4.00 hours they get their whole day rate."  *Id.*

### C.    *Andreu*

Plaintiff contends that this case is similar to a prior case against WP Florida, *Andreu v. Waste Pro of Florida, et al.*, No. 17-60926-CIV-WPD (S.D. Fla.).  That case involved a lawsuit

by a driver employed by WP Florida who alleged that WP Florida's day rate compensation practice violated the FLSA and entitled him to unpaid overtime compensation. Doc. 197-5. There, the court denied a motion for summary judgment filed by WP Florida, that is similar to WP Florida's Motion for Summary Judgment in this case. Doc. 207-1, Doc. 207-2. The case proceeded to a jury trial and the jury returned a verdict in favor of the *Andreu* plaintiff. Doc. 197-8.

### D. Previous Reviews of WP Florida Pay Methods

WP Florida relies on prior reviews of its pay method by the Department of Labor ("DOL"). More specifically, the DOL conducted an audit of WP Florida's compliance with the FLSA's overtime provisions for the period between August 6, 2011 through August 5, 2013. Doc. 187-1 at 11-23. The DOL Audit indicates that "employees were paid on a daily fee basis, however the firm accurately paid for their overtime hours." *Id.* at 18. The Audit explains that "employees received the same rate for each day of work," and, therefore, received half their regular rate for hours worked over 40 per week. *Id.* Additionally, the auditor does not conclude that this was altered by the payment of bonuses. *Id.* at 20. The auditor explains that "[b]onuses were divided by all hours worked during the same week in which the bonus was allocated in order to obtain the additional amount originally not included in the regular rate. Once the new rate was obtained, it was then divided by ½ and then multiplied by all the hours worked over 40 during the same workweek." *Id.*

The DOL conducted another investigation of WP Florida for the period of March 15, 2014, to March 14, 2016. *Id.* at 25-30. The report indicates that "[m]ost drivers and helpers [were] paid a day rate." *Id.* at 25. The investigation was conducted because an employee complained that he or she was not paid proper overtime because he received only half time for his or her daily rate. *Id.* at 27. With respect to the half day rate, the investigator concludes that this "was still a flat rate

without regard to the number of hours worked and did not result in an overtime violation." *Id.* at 27-28. The investigation concluded that "the drivers and helpers . . . were paid a daily rate intended to cover all hours worked," and were paid half time for hours worked in excess of 40 per week, there was no FLSA violation. *Id.* at 28.

### E. The Motions for Summary Judgment

Plaintiff filed a Motion for Summary Judgment requesting judgment with respect to three issues: (1) that Defendants' day rate overtime pay violates the FLSA; (2) that WP USA employs Plaintiff and Helpers; and (3) that WP of Florida is collaterally estopped from asserting its good faith affirmative defense in this case. Doc. 197 at 23-24.

WP USA moved for summary judgment on the basis that it does not employ Plaintiff or any Opt-In Plaintiff. Doc. 185. WP USA argues that the record evidence shows that it does not control Plaintiff's or other Helpers' conditions of employment. *Id.*

WP Florida moved for summary judgment and argues that its compensation methodology is consistent with the FLSA, 29 C.F.R. § 778.112 is not the only permissible method for compensating day rate employees, and occasional instances in which Helpers were paid the half day rate did not invalidate WP Florida's compensation methodology. Doc. 187 at 8-15. WP Florida also argues that summary judgment is appropriate for Helpers who are not adversely affected by any common policy or plan of WP Florida. *Id.* at 15-17.

## II. LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265

(1986).  The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact.  *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact.  *Id*. at 324.  Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the suit under governing law.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party.  *Celotex*, 477 U.S. at 323. However, a party cannot defeat summary judgment by relying upon conclusory allegations.  *See Hill v. Oil Dri Corp. of Ga*., 198 F. App'x 852, 858 (11th Cir. 2006).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed. *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005).  The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration.  *Id*.  The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (quoting *Bricklayers Int'l Union,*

*Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017 (5th Cir. 1975)).  Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts.  *Id*. at 1555-56.

## III.    DISCUSSION

The FLSA states that, except as otherwise provided,

> [N]o employer shall employ any of his employees who in any workweek is engaged in commerce . . . or is employed in an enterprise engaged in commerce . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).  Time and a half overtime pay is the presumed amount to which workers are entitled as overtime pay.  *Falken v. Glynn Cty., Ga.*, 197 F.3d 1341, 1345 (11th Cir. 1999).

### A.    Plaintiff's Evidence

Defendants argue that the Court should not consider the evidence Plaintiff submits in support of his Motion for Summary Judgment because it is not authenticated and is not self-authenticating.  Doc. 210 at 2-4; Doc. 211 at 1-4.  Defendants, apparently, did not realize that a 2010 amendment to the Rule 56(c) allows parties to submit evidence that can be presented in an admissible form at trial, and requires the opposing party to object to the evidence on the basis that it "cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).

Federal Rule of Civil Procedure 56(c)(1) directs that a party must support its assertion that a fact cannot be genuinely disputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  This may be objected to by the other party on the basis that "a fact *cannot* be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).

The practice commentary to Rule 56 explains that "parties who want the court to consider documentary evidence must be sure to include it in the record and to make sure that it is properly authenticated (usually by affidavit) and otherwise admissible." Fed. R. Civ. P. 56, Rules and Commentary (citing *Woods v. City of Chi.*, 234 F.3d 979, 988 (7th Cir. 2000)). The commentary further explains that the party submitting documents that are not self-authenticating may "meet the authentication requirement by attaching the documents to an affidavit of a witness who can authenticate them," Federal Rule of Civil Procedure 56, Rules and Commentary (citations omitted), or "through deposition testimony," *id.*

Prior to 2010, a party was required to authenticate documents for them to be considered in support of summary judgment. However, Rule 56 was amended in 2010 so that authentication is no longer required until an objection is raised that the evidence *cannot* be submitted in an admissible form. *Abbott v. Elwood Staffing Servs., Inc.*, 44 F. Supp. 3d 1125, 1134 (N.D. Ala. 2014) (quoting *Foreword Magazine, Inc. v. OverDrive, Inc.*, No. 1:10-cv-1144, 2011 WL 5169384, at *2 (Oct. 31, 2011)). The advisory committee explained the amendment, stating that such an "objection functions much as an objection at trial, adjusted for the pretrial setting," and that "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." Fed. R. Civ. P. 56, Advisory Comm. Notes.

Here, Defendants do not raise a sufficient objection to the documentary evidence submitted by Plaintiff to support his Motion for Summary Judgment because they do not argue, as Rule 56 requires an objection to do, that the evidence "cannot be presented in a form that would be

admissible evidence." Fed. R. Civ. P. 56(c)(2). Accordingly, the Court will consider the documents provided by Plaintiff to support his Motion for Summary Judgment.[2]

### B. Single Enterprise

To establish that two entities are a single enterprise, a plaintiff must demonstrate: (1) related activities; (2) unified operation or common control; and (3) a common business purpose. *Donovan v. Easton Land & Dev. Co.*, 723 F.2d 1549, 1551 (11th Cir. 1984). Because the FLSA is to be construed liberally, *Dunlop v. Ashy*, 555 F.2d 1228, 1234 (5th Cir. 1977), the Court must construe the definition of "enterprise" liberally, *Williams v. Johnny Kynard Logging, Inc.*, No. 2:11-CV-2138-VEH, 2013 WL 2107658, at *6 (N.D. Ala. May 10, 2013). Whether two entities constitute an enterprise is a question of law for the court to decide. *Cabral v. Lakes Café Sports Bar & Grill, Inc.*, No. 09-21128-CIV, 2010 WL 1372457, at *3 (S.D. Fla. Mar. 31, 2010) (citing *Tafalla v. All Fla. Dialysis Serv., Inc.*, No. 07-80396, 2009 WL 151159, at *9 (S.D. Fla. Jan. 21, 2009)).

However, establishing that two entities are a single enterprise does not establish that both are potentially liable. *Patel v. Wargo*, 803 F.2d 632, 636 (11th Cir. 1986). Instead, whether entities are a single enterprise is relevant to determining coverage under the FLSA. *Id.* at 635. To establish liability for two entities, the plaintiff must show that there is a joint employer relationship. *Id.* ("There is no suggestion in the language of the [FLSA] that an employer is responsible to other employers' employees, unless of course there is a joint employer relationship.").

Here, WP USA does not contest whether it is a covered employer under the FLSA. Doc. 210 at 6. Because whether WP Florida and WP USA are a single enterprise is not determinative

---

[2] Plaintiff responds that his evidence will be admissible at trial because Defendants produced the documents and emails and created the website whose pages Plaintiff relies on. Doc. 22, p. 7-8.

of liability, the issue on which Plaintiff seeks summary judgment, the Court need not address whether Defendants are a single enterprise.  *Id.*

## C.    Joint Employer

"The overtime wage provisions of the FLSA apply only to workers who are 'employees' within the meaning of the Act."  *Tafalla v. All Fla. Dialysis Servs., Inc.*, No. 07-80396-CIV, 2009 WL 151159, at *5 (S.D. Fla. Jan. 21, 2009) (quoting 29 U.S.C. § 206(a)(1)).  An employee is defined by the FLSA as an "individual employed by an employer."  29 U.S.C. § 203(e)(1).  An employer includes "any person acting directly or indirectly in the interest of an employer in relation to an employee."  *Id.* § 203(d).

"A joint employer relationship can be found where 'one employer[,] while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer.' "  *E.E.O.C. v. Papin Enters.*, 6:07-cv-1548-Orl-17GJK, 2009 WL 961108, at *8 (M.D. Fla. Apr. 7, 2009) (quoting *Virgo v. Riviera Beach Assocs.*, 30 F.3d 1350, 1360 (11th Cir. 1994)).  In determining whether entities are joint employers, a court "focus[es] on the entities' relationships to a given employee or class of employees."  *Peppers v. Cobb Cty., Ga.*, 835 F.3d 1289, 1300 (11th Cir. 2016) (quoting *Sandoval v. City of Boulder, Colo.*, 388 F.3d 1312, 1324 (10th Cir. 2004)).  "A determination of joint employment status under the FLSA is a question of law."  *Tafalla*, 2009 WL 151159, at *5 (citing *Antenor v. D&S Farms*, 88 F.3d 925, 929 (11th Cir. 1996).

In *Patel v. Wargo*, 803 F.2d at 634, the Eleventh Circuit has explained that whether defendants are "employers within the meaning of [the FLSA] is a legal determination," but that "the individual findings of fact which led to that legal determination [are] examined under the clearly erroneous standard."  The Eleventh Circuit recognized that prior law "wavered" as to

whether joint employment status was a legal or factual issue.  *Id.* at 634 n.1.  The Court stated, however, that "[t]he weight of authority in other circuits support [its] characterization of the question as one of law, with the subsidiary findings being issues of fact."  *Id.*  The Eleventh Circuit later explained that in reviewing a summary judgment motion in favor of the defendant on the issue of joint employment the Court "must determine whether there are genuine issues of material fact and, if not, whether the [defendants] were entitled to judgment on the question of joint employment as a matter of law."  *Antenor v. D&S Farms*, 88 F. 3d 925, 929 (11th Cir. 1996).

Where issues of fact exist within the employment inquiry, this Court has taken different approaches.  For example, in *Schumann v. Collier Anesthesia, P.A.*, No. 2:12-cv-347-FtM-29CM, 2017 WL 1207263, at *2-3 (M.D. Fla. Apr. 3, 2017), the Court denied a motion for summary judgment as to joint employer status because of issues of fact on the matter and concluded that in such circumstances "employment status becomes a mixed issue of law and fact to be resolved by a jury, assuming one has been properly demanded . . . ."  *Id.*  By contrast, in *Vondriska v. Cugno*, No. 8:07-cv-1322-T-24TGW, 2010 WL 3245426, at *2 (M.D. Fla. Aug. 17, 2010), the Court, on remand, denied the parties' motions for summary judgment because issues of material fact existed as to the issue of whether the defendant employed the plaintiff, and conducted a bifurcated bench trial on the issue.  There, the Court stated that "[c]ontrolling Eleventh Circuit precedent mandates that the issue of whether the defendant is an employer is a question of law, 'with the subsidiary findings being issues of fact.' "  *Id.*  The Court concluded that those issues of fact would be resolved by a "miniature bench trial."  *Id.*

In determining whether a joint employment relationship exists, a court looks to the "economic reality" of the relationship between the plaintiff and the alleged employer "to determine whether the surrounding circumstances show that the plaintiff is economically dependent on the

putative employer." *Id.* (citing *Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 33 (1961)). The following factors have been identified by the Eleventh Circuit as relevant to the determination of whether an employee is economically dependent on, and employed by, another entity: (1) the nature and degree of control of the alleged joint employer over the employee; (2) the degree of supervision over work, either direct or indirect; (3) the right to hire, fire, or modify the employment conditions; (4) the power to determine the workers' pay or method of payment; (5) the preparation of payroll and payment of wages; (6) the ownership of facilities where the work occurred; (7) the performance of a job integral to the business, and (8) the relative investment in the equipment and facilities. *Id.* (citing *Antenor v. D&S Farms*, 88 F.3d 925, 929 (11th Cir. 1996)). These factors are weighted collectively and qualitatively. *Id.* (citing *Antenor*, 88 F.3d at 929).

### 1. Nature and Degree of Control

"For purposes of analyzing the nature and degree of a purported joint employer's control over an alleged employee, courts have held that '[c]ontrol arises . . . when the [purported joint employer] goes beyond general instructions . . . and begins to assign specific tasks, to assign workers, or to take an overly active role in the oversight of the work.' " *Molina v. Hentech, LLC*, No. 6:13-cv-1111-Orl-22KRS, 2015 WL 1242790, at *3 (M.D. Fla. Mar. 18, 2015) (quoting *Layton v. DHL Express (USA), Inc.*, 686 F.3d 1172, 1178 (11th Cir. 2012)). "A purported employer takes an overly active role in the oversight of work 'when it decides such things as (1) for whom and how many employees to hire; (2) how to design the employees' management structure; (3) when work begins each day; (4) when the laborers shall start and stop their work throughout the day; and (5) whether a laborer should be disciplined or retained.' " *Id.* (quoting *Layton*, 686 F.3d at 1178). To demonstrate such control, the plaintiff must "reference[] specific instances where the control allegedly occurred." *Id.* (citing *Layton*, 686 F.3d at 1178).

In support of this factor, Plaintiff cites to a document describing WP USA's payroll process, sent from Sharon Tolopka, WP USA's Director of Payroll and Human Relations Systems, to its Chief Accounting Officer, Judith Craigo, which states that WP USA employs 2800 people. Doc. 197-33 at 77:1-4; Doc. 197-35 at 3. The document indicates that all divisions are on the same pay period, pay employees on the same date, and that WP USA requires direct deposit. *Id.*

The document also states that Department Managers and Division Managers have access to the timekeeping system to make necessary adjustments and that each employee is required to approve his or her own time. *Id.* Additionally, individual divisions' payroll administrators or office managers have access to the systems and complete day-to-day activities. *Id.* With respect to time sheets, after they are signed by employees, Department Managers approve the time sheets and add any discretionary bonuses. *Id.* at 4. The HR administrator makes any required changes with department manager's approval. *Id.* Once labor hours are approved, the HR administrator for the division notifies corporate payroll. *Id.* Once all division approvals are received, the Corporate Payroll Department checks for missing documents, runs and reviews a detailed report. *Id.* Corporate HR reviews the amounts for reasonableness, makes any necessary changes, and payroll is generated once approved by Corporate Payroll. *Id.* The gross amount of payroll is withdrawn from WP USA's account. *Id.* at 5.

However, the payroll process document indicates that, although applicants apply online through WP USA's webpage, "[e]ach division is responsible for its own hiring." *Id.* at 3. More specifically, the division or department manager approves new hires after an interview, drug test, and background check. *Id.* With respect to termination, the document states that a form is completed by the department manager and submitted to the payroll administrator. *Id.* at 7. The HR administrator or office administrator enters the termination date and changes the employee's

status to terminated. *Id.* WP USA recommends an exit conference or checklist be completed or signed by both the employee and the employer. *Id.*

This is the only evidence Plaintiff cites in his Motion for Summary Judgment regarding this factor, and Plaintiff contends that it left "no doubt that WP USA *controls all aspects* of Plaintiff's and Opt-In Plaintiffs' employment." Doc. 197 at 39 (emphasis in original). This evidence, however, does not demonstrate that WP USA takes an active role in Plaintiff's or other Helpers' work, such as how many employees to hire, when work begins each day, when work stops each day, or whether workers should be disciplined or retained. *Molina*, 2015 WL 1242790 at *3 (quoting *Layton*, 686 F.3d at 1178). Indeed, the document demonstrates the opposite regarding decisions on whether to hire and fire workers.

Plaintiff relies on additional evidence in his Response to WP USA's Motion for Summary Judgment.[3] He cites to the WP USA Employee Handbook as evidence that all employees are offered the same benefits and sick day structure, and that WP USA maintains a centralized accrual system for vacation requests. Doc. 206-13 at 29, 60-61. Additionally, Plaintiff notes that, pursuant to the payroll document, Corporate HR reviews a report of new hires each pay period. Doc. 197-35 at 3. However, the document does not state that the hiring process is overseen or approved by Corporate HR.

Further, Plaintiff executed a declaration in which he states that he is employed by both Defendants and that it has been clear during his employment that he works for WP USA, which hired him and set up his interview. Doc. 206-14 ¶¶1-3. He states that he was sent to a WP USA location, where he was hired, and he was provided numerous documents that bore the WP USA

---

[3] Plaintiff relies on evidence that WP USA creates the job description for the Helper position. Doc. 206 at 7-8. However, in the citation provided by Plaintiff, the deponent testified that he does not know who created the document referred to in his deposition. Doc. 206-1 at 154:8-9.

name, including training materials of WP USA. *Id.* ¶¶ 4-5, 8. He also states the he received a WP USA employee identification number, the garbage trucks display the WP USA logo, and the timekeeping system he uses and any payroll issues are handled by WP USA. *Id.* ¶¶ 6-7, 9, 12. Plaintiff indicates that he is advised of policy changes by WP USA newsletters and other documents. *Id.* ¶ 13. Plaintiff further states that he was disciplined on two occasions for missing a day and insubordination and received a progressive disciplinary form from WP USA when that happened. *Id.* ¶ 14. Plaintiff's understanding is that WP USA has the power to fire him. *Id.* ¶ 15.

Other helpers executed substantially similar declarations, although they contain different facts regarding discipline or termination. Docs. 206-15, 206-16, 206-17. For example, Israel Baptiste states that he contacted WP USA when he was fired, which advised it would investigate the circumstances surrounding his termination.[4] Doc. 206-15. Marco Coates states that he was suspended for leaving one day for personal reasons and received a progressive disciplinary form from WP USA. Doc. 206-16.

WP USA relies on various declarations in support of its Motion for Summary Judgment, which Plaintiff argues do not weigh against this factor because, although the declarations indicate that the various regions have the power to hire, fire, train, and create policies for the Helpers within their divisions or regions, the declarations and other evidence do not demonstrate that the subsidiaries actually deviated from WP USA's policies. WP USA relies on declarations by the Regional Vice President of WP Louisiana (Doc. 185-1), a Divisional Vice President of WP Georgia (Doc. 185-2), a Divisional Vice President of WP North Carolina (Doc. 185-3), and Divisional Vice President for WP Alabama. (Doc. 185-4). Randall J. Waterland, the Regional

---

[4] Opt-In Plaintiff Israel Jean Baptiste has been terminated from this litigation as his claims against Defendants are time-barred.

Vice President for WP Louisiana states that he acts as the CEO for his region, with full authority to make all decisions, including staffing, training, compensation, and purchasing and maintaining equipment. Doc. 185-1 ¶ 1. WP Louisiana has multiple divisions, and the division managers decide whether to hire and fire Helpers, and also determine their pay. *Id.* ¶¶ 4-5, 9. The divisions make decisions regarding routes and, based on the route needs, how many days Helpers work, the hours worked, and the routes worked. *Id.* ¶ 8. Additionally, performance evaluations and criteria are determined by the division managers. *Id.* ¶ 11. Waterland indicates that WP USA's only role is to provide guidance and ensure that payroll records are timely submitted. *Id.* ¶¶ 10, 12. The declarations by the divisional vice presidents include similar statements regarding their autonomy within their divisions. *See generally* Docs. 185-2, 185-3, 185-4.

Notwithstanding the declarations, Plaintiff contends that the various divisions follow the so-called recommended policies without altering them. Doc. 206 at 8-10. Generally, Plaintiff argues that the declarations are immaterial because WP USA does not show that any of the regions or divisions actually vary from the WP USA handbook or guidelines. For example, Plaintiff argues all subsidiaries use central corporate documents as the foundation of their training without material variations. To support this, Plaintiff cites to Banasiak's deposition testimony that the starting point of the regions' training documents comes from WP USA's intranet. Doc. 206-1 at 147:2-7. With respect to differences, Banasiak testified that the actual training would be different because it was done by different people who might show different examples, or train in a different order, or have items in the classroom that others did not have. *Id.* at 146:15-19.

Plaintiff also contends that the WP USA Employee Handbook provides the guidelines for all aspects of Helpers' employment, including rules, compensation, benefits, timekeeping, and attendance policies. The Handbook includes a progressive disciplinary policy that Plaintiff asserts

Banasiak admitted is consistent with a form used by WP Florida without modification. Doc. 206-1 at 134:12-135:9. In fact, Banasiak testified that although the form originated from the WP USA intranet, he believed that the one currently used in his region was different. *Id.* at 135:2-9. Nonetheless, Plaintiff also asserts that WP USA controls termination because it provides the termination process in the handbook and payroll document. Doc. 206 at 10. This evidence, however, does not indicate that WP USA is involved in the actual termination decision, or controls that decision. *Layton*, 686 F.3d at 1178 (stating that control arose when the purported employer actively took a roll in oversight, including by deciding whether the employee should be disciplined). Instead, it is simply general policy information.

Additionally, Plaintiff maintains that WP USA controls evaluations, raises, and termination. Doc. 206 at 10. Plaintiff relies on the payroll document, which states that employee evaluations should occur on the employee's anniversary date or a designated common review date. Doc. 197-35 at 5. The document does not indicate that WP USA performs the evaluations. Similarly, Plaintiff's reliance on the statement in the document that an employee's raise must be entered into the ADP Vantage program and submitted for electronic approval is not demonstrative of this factor because nothing indicates that WP USA exercised oversight of this decision. Instead, the payroll document states that raises are recommended by division managers and approved by a Regional Vice President. *Id.* Thus, they are controlled by the subsidiary and not WP USA.

In *Braden v. County of Washington*, No. 08-574, 2010 WL 1664895, at *7 (W.D. Penn. Apr. 23, 2010), the Pennsylvania district court rejected a plaintiff's argument, analogous to the argument made here, regarding an alleged employer's joint employment where the plaintiff relied primarily on the defendant's "involvement in payroll and benefits administration, the [d]efendant's presence during the hiring process, the fact that [d]efendant's HR provided support to court-

related[5] employees, that [the plaintiff's undisputed employer] followed or adopted certain . . . policies [of the alleged joint employer], and . . . that [the alleged joint employer] recommended that [the p]laintiff be suspended, written up, and fired." (internal footnote omitted). The plaintiff in that case relied on these factors to demonstrate that the alleged joint employer had "control over the employee's daily activities and working conditions . . . ." *Id.* at *6. The district court concluded that there was no evidence that the alleged joint employer had direct or indirect control over the plaintiff's work schedule or working conditions, that the evidence demonstrated that the alleged joint employer approved, rather than determined, the rate and method of the plaintiff's compensation, and the evidence did not show that the alleged joint employer had the power to determine, or take action to hire or fire her. *Id.* at *7. Additionally, the alleged joint employer did not give the plaintiff work assignments. *Id.* The *Braden* court was not persuaded by the plaintiff being told and believing that she was an employee of the alleged joint employer because "[j]oint employer status . . . does not turn on the perceptions of the employee" and the human resources support was more "akin to an administrative function" rather than "an exercise of the requisite control." *Id.*

Although the instant case differs slightly from *Braden* because there is evidence that Plaintiff's supervisors report to Jennings, who was also involved in WP USA, that consideration falls more properly under the next factor. As in *Braden,* although WP USA is involved in general policies and oversight of payroll, no evidence shows that WP USA takes an active role in Helpers' schedules, specific route assignments, or training. Accordingly, no genuine issue of material fact exists as to this factor. Instead, the evidence indicates that WP USA does not take an active role

---

[5] The plaintiff worked for the Domestic Relations Section ("DRS") of a county court. *Braden*, 2010 WL 1664895, at *1.

in oversight of Helpers' work. *See also Spears v. Choctaw County Commission*, No. 07-0275-CG-M, 2009 WL 2365188 (S.D. Ala. July 30, 2009) (County Commission was not a joint employer where sheriff decided who to hire and fire, who to assign specific tasks to, assigned schedules, and resolved issues regarding discipline.).

Here, even if WP USA had broad authority regarding policies and budget, the undisputed evidence shows that supervisory and control matters were left to individual regions and divisions. The undisputed evidence pertaining to this factor suggests that WP USA is not a joint employer.

## 2.     Degree of Supervision over Work

"Supervision can be present regardless of whether orders are communicated directly to the alleged employee or indirectly through the contractor." *Layton*, 686 F.3d at 1178-79 (citing *Aimable v. Long & Scott Farms*, 20 F.3d 434, 441 (11th Cir. 1994)). "[I]nfrequent assertions of minimal oversight do not constitute the requisite degree of supervision." *Id.* (citing *Martinez-Mendoza v. Champion Intern. Corp.*, 340 F.3d 1200, 1211 (11th Cir. 2003)).

With respect to this factor, Plaintiff asserts in his Motion for Summary Judgment, and in his Response to WP USA's Motion for Summary Judgment, that WP USA has significant supervision over the work performed at its subsidiaries and in its regions. Specifically, Jennings, the chairman of the board of WP USA, communicates with the Regional Vice Presidents regularly regarding business matters, frequently visits subsidiaries to check on the status of the regions and monitor work, and creates the policies, procedures, and work rules for Helpers across all regions. Doc. 197 at 39.

With respect to meetings between Regional Vice Presidents and Jennings, the evidence Plaintiff cites shows that Mills, a Regional Vice President, met with Jennings when he was hired (Doc. 197-26 at 18:12-17), Jennings meets with Regional Vice Presidents approximately three

times per year (Doc. 197-27 at 23:1-4), and the director of HR visits the divisions on a quarterly basis to review accidents and workers' compensation claims with the division managers (Doc. 197-10 at 31:8-32:9). Also, the director of HR created a handbook that can be used by the subsidiaries if they chose to use it. *Id.* at 93:3-94:25.

Additionally, Plaintiff relies on his and other Helpers' declarations which indicate that WP USA maintains the timekeeping system and provides monthly newsletters, bulletins, and policy changes or corporate mandates. Doc. 206-14 ¶¶ 7, 14; Doc. 206-15 ¶¶ 6, 12; Doc. 206-16 ¶ 6; Doc. 206-15 ¶¶ 6, 12.

None of this evidence demonstrates that WP USA supervises Plaintiff's or Helpers' work. Instead, it demonstrates that WP USA is involved in some capacity in overseeing management and reviewing safety and claims against the subsidiaries. Whether an entity is a joint employer "is determined by focusing on the entities' relationships to a given employee or class of employees. The joint employer relationship, in other words, is employee-specific." *Peppers*, 835 F.3d at 1300. Plaintiff fails to tie his evidence regarding supervision to himself or Helpers as a class. Accordingly, the undisputed evidence related to this factor suggests that WP USA is not a joint employer.

### 3. Right to Hire, Fire, or Modify Employment Conditions

Plaintiff argues that WP USA's Chief Executive Officer and/or Board of Directors hire and fire the Regional Vice Presidents who oversee WP USAs regions. Doc. 197 at 39. With respect to this assertion, because the inquiry is specific to the employee in question, or class of employees, this assertion is not relevant. *Peppers*, 835 F.3d at 1300.

Plaintiff also relies on a statement in the employee handbook that "[n]o supervisor or member of management, except John Jennings (President & CEO), has the authority to bind the

company to any employment contract for any specified period of time with any employee, either verbally or in writing." Doc. 197-41 at 14. Additionally, Plaintiff generally relies on the handbook, which Plaintiff argues sets uniform workplace rules and policies that Helpers are required to follow and which advises that the violation of the policies and procedures would subject employees to disciplinary action, including termination. Doc. 197 at 40. However, evidence demonstrates that the regions were free to accept the handbook if they chose to, and change it if they chose to. Doc. 197-10 at 94:23-25; Doc. 206-1 at 119:3-13.

Plaintiff also submits his and other Helpers' declarations stating that they were hired by WP USA and that it is their understanding that if anyone at WP USA is unhappy with their work, WP USA has the power to fire or discipline them. Docs. 206-14, 206-15, 206-16, 206-17. On the other hand, WP USA submitted declarations providing that division managers control decisions regarding hiring and firing. Doc. 185-1, 185-2, 185-3, 185-4. Plaintiff's and Opt-In Plaintiffs' declarations conflict with the declarations submitted by WP USA regarding whether WP USA had the authority to hire, fire or discipline Helpers. Thus, a genuine dispute of fact exists with regard to this factor.

### 4. Power to Determine Workers' Pay or Method of Payment

Plaintiff relies on evidence that WP USA recommended use of the day rate and explained how it works. Doc. 197-42; Doc. 206-1 at 107:9-19. Nonetheless, the evidence Plaintiff submits also shows that some Helpers are paid on an hourly basis, and not through the day rate, supporting Defendants' assertion that WP USA does not mandate pay method. Doc. 197-4. Plaintiff also relies on evidence that all subsidiaries used the half day rate. Doc. 197-13; Doc. 197-14; Doc. 206-1 at 125:14-21. Additionally, Plaintiff cites to evidence that WP USA employees, including Jennings, are actively involved in bonus decisions and pay adjustments for employees.

Nonetheless, even that evidence demonstrates that, although Jennings was aware of such decisions, the decisions are made by the regional vice president. Doc. 206-21.

Evidence also demonstrates that with respect to specific pay rates and methods, division managers make such decisions. Doc. 123-6 ¶ 12; Doc. 206-1 at 181:2-23. Decisions regarding whether to pay safety bonuses are made by region and division. Doc. 185-5 at 8.

The evidence demonstrates that although WP USA makes recommendations and provides explanations—essentially, support—regarding how to pay Plaintiff and Helpers, no evidence shows that WP USA makes specific, individual decisions, or mandates a specific amount of pay or method of payment. Accordingly, the undisputed evidence related to this factor suggests that WP USA is not a joint employer.

### 5.      Preparation of Payroll and Payment of Wages

This factor weighs in favor of a finding that WP USA jointly employs Plaintiff and other Helpers. Although WP USA argues, and the evidence is undisputed that, individual subsidiaries prepare the payroll and pay wages, substantial other evidence shows that the process is managed by WP USA. Doc. 197-35 at 3. Additionally, WP USA maintains the health insurance and 401(k) plans of all employees. 206:108:18-20. The gross amount of the withdrawal is taken from WP USA's operating account. *Id.* at 5. However, the subsidiaries employ human resources employees who handle payroll at a more local level. *Id.* at 4; *see also* Doc. 185-1 ¶ 12. Accordingly, undisputed evidence demonstrates that WP USA is involved in preparation of payroll and payment of wages and this factor suggests that WP USA is a joint employer.

### 6.      Ownership of Facilities

With respect to this factor, Plaintiff argues that WP USA owns 100% of its subsidiaries and is the only shareholder. Doc. 197-25; Doc. 197-27 at 15:1-9. Additionally, Plaintiff relies on

evidence that Jennings publicized that he secured a $715 million recapitalization and $500 million senior note offering, for which he used WP USA subsidiaries' assets as collateral.  Doc. 197-27 at 49:24-52:9.  Plaintiff further argues that this factor weighs in favor of joint employment because Jennings directs the subsidiaries as part of a full service, vertically integrated waste management company.  *Id.* at 7:7-9; Doc. 206-7.  In addition, WP USA maintains vehicle records.  Doc. 206-1 at 73:23-74:4.

Defendant's declarations provide that the facilities used by the various subsidiaries are owned or leased by the subsidiaries.  Doc. 185-1 ¶ 13, Doc. 185-2 ¶ 13, Doc. 185-3 ¶ 12, Doc. 185-4 ¶ 13.  The subsidiaries likewise own the trucks used by Helpers.  Doc. 206-1 at 128:23-129:3.

The evidence Defendants submit is more reflective of ownership of facilities and equipment used by Plaintiff and Helpers to perform their jobs.  Plaintiff does not provide any evidence that the facilities and equipment are actually owned by WP USA, only that WP USA owns the subsidiaries, and therefore is the ultimate owner of these assets.  Plaintiff cites to no law indicating that the Court should ignore corporate structures in determining ownership.  Accordingly, the undisputed evidence related to this factor weighs in favor of a conclusion that WP USA is not an employer of Plaintiff or Helpers.

### 7. Performance of Job Integral to Business

"A task or activity is considered 'integral' to an employer's business when that employer 'would be virtually certain to assure that the function is performed, and would obtain the services of whatever workers are needed for this function."  *Martinez-Mendoza*, 340 F.3d at 1213.

Plaintiff contends that WP USA is in the trash removal business and Plaintiff and other Helpers are integral to that business because they are responsible for assisting in picking up

garbage, yard waste, and recycling.  Doc. 197-2; Doc. 206-1 at 30:23-31:1.  Regarding evidence of WP USA being in the trash removal business, Plaintiff cites to evidence that WP USA advertises itself as such on its webpage.  Doc. 197-24.

WP USA argues that this factor is not relevant, citing to *Hankerson v. Fort Lauderdale Scrop, Inc.*, No. 15-60785-CIV, 2016 WL 7508242, at *3 (S.D. Fla. Sept. 8, 2016).  The court in *Hankerson* cites to no authority for its position that this factor is relevant only when one employer contracted with another entity.  As pointed out by Plaintiff, other courts in the Eleventh Circuit have analyzed this factor.  Accordingly, the Court will consider this factor in weighing all factors.

A review of the record shows that during his deposition, Banasiak testified that it would not be fair to say that WP USA is "a company that handle[s] waste and recycling for residential and business companies," because it does not have any trucks or resources, such as employees, for the collection of waste.  Doc. 206-1 at 18:25-19:14.  This conflicts with the evidence presented by Plaintiff that WP USA holds itself out as a waste removal company.  Doc. 206-7.  Accordingly, disputed facts exist with respect to this factor.

### 8.    Investment in Equipment and Facilities

"This factor informs [the court's] inquiry because workers are more likely to be economically dependent on the person who supplies the equipment or facilities."  *Garcia-Celestino v. Consol. Citrus Ltd. P'ship*, No. 2:10 C 542-MEA-DNF, 2015 WL 3440351, at *23 (M.D. Fla. May 28, 2015) (internal quotation omitted), *aff'd in part, rev'd in part on other grounds*, 842 F.3d 1276 (11th Cir. 2016).

Plaintiff cites to evidence that WP USA provides the capital to purchase equipment.  Doc. 197-27 at 50:21-25; Doc. 197-28 at 2.  Defendant cites to evidence that the facilities and trucks

are owned or leased by the subsidiaries.  Doc. 185-1 ¶ 13, Doc. 185-2 ¶ 13, Doc. 185-3 ¶ 12, Doc. 185-4 ¶ 13; Doc. 206-1 at 128:23-129:3.

Here, the undisputed evidence shows that the subsidiaries supply the equipment or facilities, but that the investment into the equipment or facilities may be made by WP USA. Accordingly, this factor suggests that WP USA is a joint employer of Plaintiff or Helpers.

### 9. Assessment of the Factors

Of the eight factors, the undisputed evidence with respect to the first, second, fourth, and sixth (the nature and degree of control, the degree of supervision, the power to determine pay, and ownership of the facilities), weigh in favor of a finding that WP USA is not a joint employer.  The fifth and eighth factors (preparation of payroll and payment of wages, and investment in equipment and facilities), weigh in favor of a finding that WP USA is a joint employer.  The remaining two factors (the right to hire, fire or modify employment conditions, and performance of a job integral to the business), have disputed facts and cannot assist the Court for purposes of summary judgment.

No one factor in this analysis is dispositive. *Martinez-Mendoza*, 340 F.3d at 1209.  Instead, "[i]n entertaining and assessing the evidence relevant to the inquiry called for by a given factor, the question the district court must ask itself is whether such evidence, considered as a whole, supports (or fails to support) the [plaintiff's] claim that he is economically dependent on the putative employer . . . ." *Id.*  Ultimately, "[t]he facts the court finds at the end of each inquiry become pieces of circumstantial evidence which, together, yield inferentially one of two ultimate facts:  joint employment exists or it does not." *Id.*  The burden of proof falls on the plaintiff to establish joint employment by a preponderance of the evidence. *Id.*

Based on the above, the Court cannot determine at this stage whether WP USA is a joint employer of Plaintiff or other Helpers. Resolution of the remaining factors, for which the evidence is conflicting, is critical to the Court's determination. If WP USA does have the right to hire, fire, or determine the conditions of Plaintiff's employment, this would weigh heavily in favor of a conclusion that WP USA is a joint employer. On the record before the Court, neither Defendant WP USA nor Plaintiff are entitled to judgment, as a matter of law, on the question of joint employment. Accordingly, WP USA's Motion for Summary Judgment (Doc. 185) is denied. Likewise, Plaintiff's Motion for Summary Judgment on the issue of joint employment (Doc. 197) is denied.

### D. Day Rate, Half Day Rate, and Bonuses Under the FLSA

The Code of Federal Regulations describes a "regular rate" under the FLSA as "a rate per hour." 29 C.F.R. § 778.109. Section 778.109 explains that the FLSA "does not require employers to compensate employees on an hourly rate basis," and employees' "earnings may be determined on a piece-rate, salary, commission, or other basis, but in such case the overtime compensation due to employees must be computed on the basis of the hourly rate derived therefrom and, therefore, it is necessary to compute the regular hourly rate of such employees during each workweek . . . ." *Id.* To determine an employee's regular hourly rate of pay, his or her "total remuneration for employment . . . in any workweek" is divided "by the total number of hours actually worked by him in that workweek for which such compensation was paid." *Id.* Sections of the Code of Federal Regulations "give some examples of the proper method of determining the regular rate of pay in particular instances." *Id.*

One section 778.112, which relates to "day rates and job rates," provides as follows:

If the employee is paid a flat sum for a day's work or for doing a particular job, without regard to the number of hours worked in the day or at the job, and if he

> receives no other form of compensation for services, his regular rate is determined by totaling all the sums received at such day rates or job rates in the workweek and dividing by the total hours actually worked. He is then entitled to extra half-time pay at this rate for all hours worked in excess of 40 in the workweek.

Unlike other sections, which permit an employee to be paid the hourly rate for overtime hours *and* an additional half of the hourly rate for the hours in excess of forty during the week, day rate employees under section 778.112 receive only half of their hourly rate for hours worked in excess of forty during the workweek.[6]

WP Florida[7] argues that section 778.112 is just an example or illustration of how to calculate the regular rate and that it does not provide stringent parameters for the only instances when overtime may be paid at half the regular rate. Doc. 211 at 10. WP Florida contends that even if it did not pay Plaintiff strictly in accordance with section 778.112, because it used a day rate, Plaintiff was entitled only to half of his regular rate as a day rate worker. Doc. 187 at 9. WP Florida relies on *Allen v. Board of Public Education for Bibb County*, 495 F.3d 1306 (11th Cir. 2007), in support of this argument.

In *Allen*, bus drivers, bus monitors, paraprofessionals, secretaries, and custodians filed an action alleging violation of the FLSA based on an alleged failure to pay the appropriate regular

---

[6] The United States Court of Appeals for the Fifth Circuit previously found this to be a permissible interpretation by the Secretary of Labor of the FLSA's prescription that employees receive one and one-half of their regular rate of compensation for hours worked in excess of forty per week "because each employee is receiving 100% of his regular rate for each hour worked, plus and additional one-half of that regular rate for each hour in excess of 40 in a week . . . ." *Dufrene v. Browning-Ferris, Inc.*, 207 F.3d 264, 268 (5th Cir. 2000). Plaintiff does not challenge the Secretary of Labor's interpretation in section 778.112, but argues that section 778.112 does not apply.

[7] WP USA's Motion for Summary Judgment relates only to the issue of joint employment. Doc. 185. However, it filed a notice that in the event that the Court denied its Motion for Summary Judgment, it joined in all grounds for summary judgment raised by WP Florida. Doc. 189. Accordingly, all references regarding WP Florida in the remainder of the Order also apply to WP USA.

rate. *Id.* at 1309. With respect to bus drivers, they were paid different hourly rates depending on the type of route being driven—for example, drivers were paid various "regular route" rates depending on years of service, $6 per hour for field trips, and $7 per hour for all other routes. *Id.* at 1310. The overtime rate was calculated based on a weighted rate of pay, calculated by dividing the straight-time compensation by the number of hours worked. *Id.* at 1310-11.

29 C.F.R. § 778.115 provides guidance for "employees working at two or more rates." That section states, in pertinent part, that "[w]here an employee in a single workweek works at *two or more different types of work* for which different nonovertime rates of pay . . . have been established, his regular rate for that week is the weighted average of such rates." 29 C.F.R. § 778.115 (emphasis added). The bus drivers in *Allen* contended that use of a blended rate was permitted only if the employee was engaged in two or more different types of work and, because their jobs involved only one type of work, a weighted rate could not be employed. 495 F.3d at 1312-13.

The Eleventh Circuit rejected the plaintiffs' argument, stating that "when viewed in the proper context, it is apparent that section 778.115 contains no" mandate that employees working at two or more rates perform different types of work. *Id.* at 1312. In reaching this conclusion, the Eleventh Circuit read section 778.115 in conjunction with section 778.109's statement that the following sections were examples of how to determine the regular rate of pay. *Id.* at 1313. In reading sections 778.109 and 778.115 together, the Court stated that it became apparent that section 778.115 was "one of the examples mentioned in [section 778.109] as a way that the regular rate may be calculated in certain cases." *Id.* Accordingly, although section 778.115 "exemplifie[d] one way that a regular rate [could] be determined, it [did] not mandate that different rates of pay [were] only permitted when different types of work [were] performed." *Id.*

Here, WP Florida argues that, despite paying half-day rates and various non-discretionary bonuses, it complied with the FLSA because section 778.112, pursuant to *Allen*, is not a mandate. Doc. 187 at 11. Instead, it is an example of how to calculate the regular rate under the circumstances when a day or job rate employee receives no other form of compensation, which does not address—or preclude—situations where the employee receives a day or job rate plus other forms of compensation. *Id.* WP Florida contends that its method of including all day rates, half day rates, and weekly non-discretionary bonuses in the remuneration, divided by the hours worked, to obtain the regular rate is a permissible method of calculating the regular rate. *Id.* at 13.

Plaintiff argues that *Allen* is not applicable because the employer paid its employees overtime compensation of one and one half times the employees' regular rate of pay, whereas here, Plaintiff and other Helpers were paid only half time. Doc. 207 at 9-10. Additionally, Plaintiff argues that *Allen* interprets section 778.115, not section 778.112. *Id.* at 10.

Plaintiff's distinctions regarding *Allen* are not substantive. Specifically, the Eleventh Circuit in *Allen* explained that all sections that followed section 778.109 were examples, not only section 778.112. Additionally, half time is authorized by section 778.112, and Plaintiff does not challenge the fact that paying half time is permissible under that section. The decision in *Allen* is instructive as to the appropriate interpretation of section 778.112.

In addition to *Allen*, WP Florida relies on a 1967 DOL Opinion Letter that addresses employees paid a day rate plus an additional $2.00 per hour for extra tips. Doc. 187-1 at 5. The employer asked the DOL to clarify how it should determine these employees' regular rate of pay. *Id.* The DOL Administrator explained that the applicable section stated

> that if an employee is paid a flat sum for a day's work without regard to the number of hours worked in the day, and if he receives no other form of compensation for his services, his regular rate [of pay] is determined by totaling all the sums received at such day rates in the workweek and dividing by the total hours actually worked.

*Id.* Such an employee was "then entitled to extra half-time pay at this rate for all hours worked in excess of the applicable maximum workweek." *Id.* The Administrator further explained that in workweeks where an employee made extra tips, "the hours worked and the wages received must be added to the total hours worked and the total earnings received." *Id.* Then, "[t]he total wages at both day rates and hourly rates [were] added together and divided by the total hours worked to determine the regular rate for that week," and additional half-time was required to be paid on the new regular rate. *Id.* Based on this, WP Florida contends that it complied with the DOL's formula for calculating the regular rate and overtime for day rate employees who received other methods of compensation. Doc. 187 at 9.

Plaintiff argues that WP Florida's reliance on the DOL's interpretation is not proper because DOL interpretations lack the force of law. Indeed, the Supreme Court has explained that "[i]nterpretation[s by an agency] such as those in opinion letters . . . do not warrant *Chevron*-style deference." *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000). Instead, such interpretations are entitled only to respect to the extent that they are persuasive. *Id.* If the agency's interpretation contained in an opinion letter is not persuasive, it is not entitled to such respect. *Id.* Here, the DOL's opinion letter is persuasive and entitled to respect.

In his own Motion for Summary Judgment, and in his Response to WP Florida's Motion for Summary Judgment, Plaintiff argues that the use of additional methods of payment violates section 778.112, making it inapplicable. Doc. 207 at 6. Because, according to Plaintiff, section 778.112 is inapplicable, WP Florida is required to pay time and a half for overtime hours worked, not half time. Plaintiff cites to various cases which state that payment of other forms of compensation takes the compensation method outside of the purview of section 778.112. For example, in *Turner v. BFI Waste Services, LLC*, 268 F. Supp. 3d 831, 831 (D.S.C. 2017), a

residential waste disposal driver was paid a day rate, as well as "on an hourly basis for a variety of required tasks, including: (1) 'help pay' for time spent collecting trash on another employee's route, and (2) 'downtime' for when his truck was inoperable, when he was attending a safety meeting, or when he was training another driver." The plaintiff's employer added the hourly rates to the day rate to obtain the plaintiff's total wages for the week, then divided this by the total number of hours worked during the week to determine the plaintiff's regular rate of pay. *Id.* The employer paid half this amount for overtime hours worked. *Id.* Thus, the plaintiff in *Turner* was paid similarly to how Plaintiff was paid in this case.

The *Turner* plaintiff filed an action alleging FLSA overtime provision violations. *Id.* The plaintiff alleged that the defendant miscalculated his regular rate of pay, resulting in an illegally low overtime rate. *Id.* The plaintiff also alleged that his employer deducted a thirty-minute meal break each shift, even though he worked through the meal period, which resulted in a failure to pay all overtime hours worked. *Id.*

The district court in *Turner* concluded that the employer's hybrid day and hour rate, under which the plaintiff was not paid a day rate if he worked fewer than eight hours and was paid additional amounts on an hourly basis for various tasks, precluded the employer's argument that the plaintiff was paid a day rate. *Id.* at 838 (stating that it was "clear that [the plaintiff] was not a day rate employee as the DOL and courts have interpreted the term to mean"). The court found this pay method to be more analogous to a fluctuating workweek payment method. *Id.*

Additionally, the court noted that "[a] review of the payroll records demonstrates that the practical consequence of [the employer's] hybrid compensation scheme is that [the plaintiff] worked a larger number of hours for a lower rate of pay." *Id.* at 839. More specifically, the employer's method of calculating overtime "led to [the plaintiff] working larger number of hours

for an increasingly low rate of pay." *Id.* "While this is not a per se violation of the FLSA, it raises questions about the validity of the hybrid compensation scheme itself . . . ." *Id.* However, ultimately, the issue on summary judgment was whether the parties had a clear and mutual understanding on whether the day rate was intended to compensate for forty hours per week, or all hours worked, as well as what type of work the day rate was intended to cover. *Id.*

*Turner* is distinguishable. Most importantly, Plaintiff does not argue here that he received an hourly rate instead of a day rate if he worked fewer than eight hours. Nor does Plaintiff argue that he was paid an hourly rate for tasks such as attending meetings. Instead, the methods of payment included the day rate, the half day rate, and bonuses, and Plaintiff argues that the day rate does not apply because whether he and other Helpers received a full day rate or a half day rate depended on the number of hours worked.

Plaintiff also relies on *Rodriguez v. Carey International, Inc.*, No. 03-22442-CIV-UNGARO-BENAGES, 2004 WL 5582173, at *7 (S.D. Fla. Sept. 15, 2004), which does not entirely support his position. In *Rodriguez*, the plaintiffs[8] were limousine drivers who were paid 60% of the trip fee charged to customers plus the mandatory 20% gratuity charged to customers. *Id.* at *1. The defendants contended that the day/job rate delineated by section 778.112 applied, whereas the plaintiffs contended it did not because they received other forms of compensation. *Id.* The court explained that section 778.112 did "not provide definitional contours," and case law did not exist to explain the clause. *Id.* However, the court stated that "the most logical and likely reasoning is that the regulation does not apply . . . if the employee is given some other form of compensation separate and apart from the job rate," such as where "an employee also receives an

---

[8] Other types of drivers who were paid differently were also involved in *Rodriguez*, but to simplify the review of the case, only these limousine drivers are discussed. This narrowing does not affect the analysis of the case.

hourly rate, salary, or commission . . . ." *Id.* The problem with including various different compensation methods, the court explained, was that it could "be totally impossible to convert any such time for which an employee was paid or should have been paid into a uniform regular hourly rate." *Id.*

Nonetheless, the court went on to say that this did "not mean that there cannot be more than one component in computing the job rate. There is no policy reason for such a prohibition, and there is no regulation or other authoritative declaration that prohibits adding different items to calculate the entirety of the job rate." *Id.* The court explained that as long as all components were "calculated as part of the job rate, there is no inconsistency that might result as it would from having a job rate and a separate hourly rate, salary, or commission engrafted onto the job rate." *Id.*

The court in *Rodriguez* determined that certain activities performed by the plaintiffs—such as training sessions or driving between jobs—did not properly fall under a per job rate that could be compensated under section 778.112. *Id.* at *8. Instead of concluding, however, that section 778.112 did not apply at all, the *Rodriguez* court simply concluded that these non-job-rate activities should be compensated in accordance with the standard formula that provided for time and a half of overtime hours. *Id.* For the job-rate activities, the plaintiffs were entitled only to half time for overtime hours. *Id.*

*Rodriguez* supports the proposition that a day rate can incorporate various types of compensation—in that case, the day rate was calculated by adding the fare plus the mandatory tip. WP Florida calculated the regular rate—not the day rate itself—by adding together fixed compensation rates. However, here, non-discretionary safety and help bonuses could easily be engrafted onto the day rate to achieve a regular hourly rate. This form of compensation is unlike

the activities involved in *Rodriguez* that depended on the amount of time spent on a task. The Court will address below the issue of whether Plaintiff's compensation of a day rate or half day rate depended on the number of hours worked. Accordingly, *Rodriguez* is not persuasive.

Other cases are more supportive of Plaintiff's position. In *Serrano v. Republic Services, Inc.*, 227 F. Supp. 3d 768 (S.D. Tex. 2017), the plaintiffs were paid through a combination of methodologies: a job/day rate, piece rate, and hourly rates. *Id.* at 770. The plaintiffs argued that this pay scheme was unlawful because section 778.112 did not allow other forms of compensation to be blended with the job or day rate. *Id.* The court concluded that section 778.112 "applies when a pay structure such as a day rate, alone, compensates the employee for all hours worked." *Id.* at 771. In other words, that section would "not apply when the flat rate is only part of the monetary compensation." *Id.* The court stated that section 778.112 "by its own terms, does not apply when the employer pays the employee monetary compensation pursuant to a combination of rates." *Id.* at 772. Because the plaintiffs in *Serrano* "receiv[ed] a combination of methods of monetary compensation as part of their wages in addition to any flat sums," the court found that section 778.112 did not apply. *Id.*

Similarly, in *Rodriguez v. Republic Services, Inc.*, No. SA-13-CV-20-XR, 2013 WL 5656129, at *1 (W.D. Tex. Oct. 15, 2013), the court found that a combination of pay rates fell outside of section 778.112. There, the plaintiffs were paid a day rate for five days, but were also required to occasionally work for a sixth day at an hourly rate based on the employee's regular rate of pay for a trailing thirteen-week average. The plaintiffs were also paid "incentive payments" of $10 for each day worked. *Id.* The defendants argued that section 778.112 applied, and the plaintiffs contended that because they received three different forms of compensation for the same service, section 778.112 did not apply. *Id.* In response, the defendants argued, as WP Florida does

here, that "sections 778.111 through 778.122 [were] mere examples of the proper method for determining the regular rate of pay," citing to the Eleventh Circuit's decision in *Allen*. *Id.* at *2. The district court was "troubled by Defendants' argument and the Eleventh Circuit's decision in *Allen*." *Id.* Specifically, the district court cited to the FLSA's prescription that employers pay employees not less than one and one-half times the employee's regular rate, and explained that the defendants' argument "flip[ped] the general rule onto its head allowing for any number of payroll methods to be employed in order to pay overtime at only the half-rate, rather than one and one-half times." *Id.* The court concluded that it would be required to re-write section 778.112 and delete the phrase "and if he receives no other compensation for his services" to apply it to the facts of the case. *Id.* Thus, the district court rejected the proposition that section 778.112 was a mere example that need not be strictly followed to pay a day rate.

This Court has also briefly addressed this issue. In *Bunday v. Suncoast Beverage Sales, LLP*, No. 2:08-CV-00769-JLQ, 2009 WL 10670167, at *6-7 (M.D. Fla. Sept. 18, 2009), the Court addressed whether section 778.112 applied to a beer sales representative who was paid a day rate, received a $5.00 bonus for completing his paperwork every day, and received a commission of $0.11 per case of beer delivered. In *Bunday*, the "[p]laintiff argue[d] that since his pay was different every day, based on whether he filled out his paperwork and how many cases he delivered, his pay, taken in the aggregate, [could not] be considered a flat rate." *Id.* at *6. The Court, relying on *Powell v. Carey International, Inc.*, 514 F. Supp. 2d 1302 (S.D. Fla. 2007), concluded that the *Bunday* plaintiff was paid a day rate because day rate payment methods could be variable as long as the employee's compensation was not anchored to or correlated with the number of hours he or she worked. *Id.* at *6-7. The Court explained that the plaintiff's compensation was "an analog to a job rate, since he was paid to complete a defined route of visits

39

each day, regardless of the length of time it took him to complete such rounds." *Id.* at *7. That other factors of his pay were variable did not alter that he was paid a job rate. *Id.*

Additionally, the Court further stated that "[d]espite the presence of a degree of murkiness due to the hybrid nature of [the plaintiff's] compensation, logic does not support [the p]laintiff's contention" that he was an hourly employee because "[h]e received $80 daily, regardless of the hours he worked." *Id.* Thus, "[p]aperwork incentives and commission notwithstanding, [the plaintiff's pay wa]s an archetypal example of a flat sum pay scheme" because "his hours could vary by large amounts and [he] would still receive the same base pay for having completed a defined set of tasks each day." *Id. Bunday* is analogous to the facts of this case, in which Plaintiff and Helpers were paid a day rate for completing their routes, but received additional compensation for other, non-routine, tasks.

Here, the Court concludes that section 778.112 need not be followed exactly with respect to paying employees a day rate. Instead, consistent with the Eleventh Circuit's decision in *Allen*, it is only an example of how to calculate the regular rate when a worker is paid a day rate. 495 F.3d at 1313. Thus, the fact that Plaintiff and Helpers received other compensation in the form of bonuses or for additional tasks does not mean they were not paid a day rate. Moreover, the payment of half day rates for tasks outside of Helpers' usual tasks does not take Plaintiff or other Helpers outside the scope of day rate employees. As the Court explained in *Bunday*, the primary payment to Plaintiff and Helpers was through a day rate, and that amount could vary based on additional tasks. Accordingly, payment of overtime to Plaintiff or Helpers at a half rate, instead of a time and a half rate, is permissible.

Plaintiff also submits evidence to demonstrate that whether he and Helpers received a day rate was tied to whether they worked four or more hours. Doc. 197-14. Doc. 197-15. This conflicts

with Banasiak's testimony that Plaintiff and Helpers received a day rate for completing their task of finishing their route, and were paid a half day rate for individual tasks that were outside of their normal route. Doc. 206-1 at 90:10, 91:16-19, 126:5-17. Thus, although the practice of paying workers a day rate for daily tasks, a half day rate for additional tasks, and bonuses, and paying overtime at a rate of half that amount instead of one and a half times that amount, is compliant with the FLSA, it is not clear that this was WP Florida's practice. To the extent that WP Florida would pay Plaintiff or Helpers only the half day rate if their daily task took less than four hours, instead of the full day rate for their daily task, the Court finds that this is not consistent with paying a day rate, or compliant with the FLSA. Because the evidence is conflicting with respect to whether payment of the day rate for a daily task was tied to the number of hours worked, the Court cannot grant summary judgment as to whether Defendants violated the FLSA.

### E.      Individuals Not Affected by Half-Day Rate Policy

WP Florida argues that the proposed collective includes all Helpers who worked at locations where there was a policy or practice of paying either a half-day rate or non-discretionary bonus, even if those Helpers were not affected by that policy, and that Opt-In Plaintiffs who were never paid a half-day rate or non-discretionary bonus suffered no injury and cannot state a claim for relief. Doc. 187 at 15-16.

In *Auer v. Robbins*, 519 U.S. 452, 455 (1997), the Supreme Court evaluated alleged FLSA violations regarding whether employees met the salary-basis test, which requires salary basis employees to regularly receive on a regular basis a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of work. Salary basis employees are exempt employees to whom the minimum wage and maximum hour requirements do not apply. 29 U.S.C. § 213. The employees in *Auer* alleged

that they were not exempt because their salary could be reduced for various disciplinary infractions related to the quality or quantity of work performed. 519 U.S. at 455. During the litigation, the issue arose as to whether employees could not meet the test for exempt status if they were actually subjected to deductions, or whether it applied when there was a theoretical possibility of deductions. *Id.* at 459. The Secretary of Labor interpreted the "test to deny exempt status when employees [were] covered by a policy that permit[ted] disciplinary or other deductions in pay 'as a practical matter.' " *Id.* at 461. The Secretary concluded the standard was met if there was "either an actual practice of making such deductions or an employment policy that create[d] a 'significant likelihood' of such deductions." *Id.* The Supreme Court explained that this policy rejected a bright line policy of requiring actual deductions, but did require "a clear and particularized policy . . . [that] 'effectively communicate[d]' that deductions [would] be made in specific circumstances." *Id.* The Supreme Court found that the Secretary's policy was not clearly erroneous. *Id.*

Plaintiff here argues that the decision in *Auer* demonstrates that the case should include Opt-In Plaintiffs who were "subject to" any unlawful day rate pay practice. Doc. 207 at 12. However, Plaintiff does not explain how the Secretary's policy regarding an exempt/non-exempt status applies to a determination of who may claim a violation of the FLSA for failure to pay overtime to non-exempt employees. Similarly, Plaintiff does not cite to any interpretation by the Secretary to which this Court would defer in the event that it was not clearly erroneous. *Auer* is not applicable here.

Plaintiff also relies on *Speer v. Cerner Corp.*, No. 14-0204-CV-W-FJG, 2016 WL 5395268, 2016 U.S. Dist. LEXIS 131230, at *32 (W.D. Mo. Sept. 26, 2016), in which the defendant argued that the named plaintiffs did "not have standing to bring claims predicated on pay types that they did not receive." The plaintiffs in *Speer* argued that the defendant "invit[ed]

42

the Court to commit legal error by conflating Article III standing with the requirements for class certification under Rule 23 and conditional certification of collective action under the FLSA." *Id.* at *33. The court agreed because the plaintiffs alleged the injury-in-fact of improper compensation for overtime worked, which was traceable to the actions of the defendant, which caused the plaintiffs' harm. *Id.* The court stated that "[j]ust because plaintiffs have pled class claims that may include those of individuals who received other types of compensation not received by the named plaintiffs does not mean that the named plaintiffs do not have standing for suit." *Id.* The court also stated that the plaintiffs pled that they were victims of a common policy or plan that applied to a broad group of individuals to which the plaintiffs belonged. *Id.* at *33-34.

Plaintiff, here, relies on *Speer* to argue that WP Florida's request for summary judgment as to Opt-In Plaintiffs not paid a half-day rate or bonuses conflated Article III's standing requirements with requirements for collective claims under the FLSA. Doc. 207 at 12-13. Plaintiff's reliance on *Speer* is misplaced. The court in *Speer* addressed whether the named plaintiffs had standing regarding pay types not received by them, not whether the class could include parties who were not affected by a common policy or plan that allegedly violated the FLSA. WP Florida's argument is that Helpers who were never paid a half day rate or discretionary bonus are not victims of any FLSA violation and, therefore, have no injury in fact.

WP Florida likewise does not provide cases on point, but cites to cases that were at the conditional certification stage and discussed inclusion of employees who were adversely affected by policies that violated the FLSA. *Longcrier v. HL-A Co., Inc.*, 595 F. Supp. 2d 1218, 1240 (S.D. Ala. 2008); *Pares v. Kendall Lakes Auto., LLC*, No. 13-20317-CIV-MORENO, 2013 U.S. Dist. LEXIS 90499, at *4 (S.D. Fla. June 27, 2013) (stating that the named plaintiffs were required to make substantial and detailed allegations of FLSA violations of which the named plaintiffs and

putative class were victims).  These cases do not address standing or the existence of an injury, nor do they discuss what it means to be adversely affected by a policy or practice that violated the FLSA.

Other cases have denied summary judgment as to individual class members who have not suffered damages.  *Khadera v. ABM Indus. Inc.*, No. C08-0417 RSM, 2012 WL 581580, at *4 (W.D. Wash. Feb. 22, 2012).  Instead, courts have treated this as a matter to be resolved when allocating damages.  *Id.* (citing *French v. Essentially Yours Indus.*, Case No. 1:07–CV–817, 2008 U.S. Dist. LEXIS 54550, 2008 WL 2788511 (W.D. Mich. July 16, 2008) (certifying Rule 23 class even though "some members may have different damages or none at all"); *In re Patriot Am. Hospitality Inc. Secs. Litig.*, MDL No C–00–1300 VRW, 2005 U.S. Dist. LEXIS 40993, *13, 2005 WL 3801594 (N.D. Cal Nov. 30, 2005) (approving class settlement where certain class members sustained no damages, but where plaintiff's expert was sufficiently able to account for those class members in allocating damages); *cf. Sibley v. Sprint Nextel Corp.*, 315 F.R.D. 642, 664 (D. Kan. 2016) (denying a motion for decertification on the basis that some class members suffered no damages, and stating that such members simply would not receive compensation).

Accordingly, the Court denies WP Florida's Motion for Summary Judgment to the extent that it seeks to eliminate Opt-In Plaintiffs on a piecemeal basis based on damages at this stage.

### F.    Collateral Estoppel

In its Answer, WP of Florida raises as an affirmative defense that it acted in good faith and had reasonable grounds to believe its acts or omissions did not violate the FLSA.  Doc. 131 at 7. Plaintiff argues in his Motion for Summary Judgment that Defendant WP of Florida is collaterally estopped from asserting the affirmative defense of good faith because it previously litigated this affirmative defense in *Andreu*.  Doc. 197 at 42-47.  WP of Florida responds that collateral estoppel

is inappropriate because *Andreu* involved different facts and issues, including the alleged failure to pay promised bonuses and involuntary work to receive bonuses. Doc. 211 at 14-16. Additionally, WP of Florida contends that it anticipates submitting witnesses and evidence not relevant to the *Andreu* trial specific to the regions at issue in this case. *Id.*

The "good faith defense is an objective test that bars actions for violations of the FLSA if the employer establishes 'that the act or omission complained of was (1) taken in good faith and (2) was in conformity with and (3) in reliance on a written interpretation by a designated agency.' " *Newby v. Great Am. Dream Inc.*, No. 1:13-cv-3297-TWT-GGB, 2014 U.S. Dist. LEXIS 158829 (N.D. Ga. Oct. 14, 2014), *Report and Recommendation adopted by*, *Berry v. Great Am. Dream, Inc.*, No. 1:13-CV-3297-TWT, 2014 U.S. Dist. LEXIS 158501 (N.D. Ga. Nov. 6, 2014) (quoting *Cole v. Farm Fresh Poultry, Inc.*, 824 F.2d 923, 926 (11th Cir. 1987)). "[T]he written administrative interpretation 'must provide a clear answer to the particular situation.' " *Ballehr v. Ctrs., Inc.*, No. 5:08-cv-261-Oc-10GRJ, 2009 WL 10670050, at *6 (M.D. Fla. Nov. 10, 2009) (quoting *Cole*, 824 F.2d at 928). "The agency designated to provide interpretations of the FLSA is the Administrator of the Wage and Hour Division of the Department of Labor." *Cusumano v. Maquipan Int'l, Inc.*, 390 F. Supp. 2d 1216, 1221 (M.D. Fla. 2005) (quoting *Cole*, 824 F.2d at 926).

"Collateral estoppel, like the related doctrine of res judicata, has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Schulman v. S. Shuttle Servs. Inc.*, No. 08-80219-CIV, 2009 WL 331550, at *2 (S.D. Fla. Feb. 10, 2009) (quoting *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 (1979)). Offensive collateral estoppel is used "when 'the plaintiff seeks to foreclose the defendant from litigating an issue the defendant

has previously litigated unsuccessfully in an action with another party.' " *Id.* (quoting *Parklane*, 439 U.S. at 326 n.4). "To claim the benefit of collateral estoppel the party relying on the doctrine must show that: (1) the issue at stake is identical to the one involved in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the determination of the issue in the prior litigation must have been 'a critical and necessary part' of the judgment in the first action; and (4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in the prior proceeding." *Pleming v. Universal-Rundle Corp.*, 142 F.3d 1354, 1359 (11th Cir. 1998). With respect to whether an issue is identical, the party opposing the application of collateral estoppel "need only point to one material differentiating fact that would alter the legal inquiry." *F.T.C. Nat'l Urology Grp., Inc.*, 785 F.3d 477, 482 (11th Cir. 2015) (quoting *CSX Transp., Inc. v. Bhd of Maint. of Ways Emps.*, 327 F.3d 1308, 1317 (11th Cir. 2003)).

The Supreme Court has cautioned that fairness to both parties must be considered when applying offensive collateral estoppel. *Cotton States Mut. Ins. Co. v. Anderson*, 749 F.2d 663, 666 (11th Cir. 1984) (citing *Parklane*, 439 U.S. at 331). "Of primary importance is whether the opposing party had an adequate incentive to litigate vigorously in the previous proceedings and whether he received a full and fair hearing in that proceeding." *Id.* "Once . . . the litigant has had a full and fair opportunity to litigate his claim, the trial court has broad discretion in deciding whether offensive collateral estoppel is appropriate." *Id.* (citing *Parklane*, 439 U.S. at 331). Additionally, "[t]he general rule is that in cases where a plaintiff could easily have joined in the earlier action or where the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel." *Newby*, 2014 U.S. Dist. LEXIS 158829, at *17.

WP of Florida contends that *Andreu* differs because it involved an alleged failure to pay promised bonuses and a resulting miscalculation of the regular rate, which is not alleged here. Doc. 211 at 15. According to WP of Florida, much of the evidence in *Andreu* related to whether the plaintiff received all of the bonuses promised to him and, if not, how much that affected his regular rate. *Id.* at 16. Based on this and other evidence, the jury in *Andreu* concluded that WP of Florida did not meet its burden of showing that its actions were taken in good faith and in conformity with and reliance on a written administrative interpretation by the DOL. Doc. 197-8 at 2.

Plaintiff replies that the material issues in this case are identical to those in *Andreu*, which focused on WP of Florida's failure to pay overtime at time-and-a-half and failure to adhere to the requirements for paying a day rate. Doc. 221 at 8. Plaintiff contends that the argument in *Andreu* that WP of Florida failed to pay bonuses two or three times was inconsequential to the verdict. *Id.*

This Court took judicial notice of documents filed in *Andreu* to the extent necessary to recognize that such filings were made, or recognize judicial acts and the subject matter of the litigation. Doc. 306. A review of the documents in *Andreu* shows that the subject matter of the litigation included a dispute as to whether WP of Florida failed to pay promised compensation, which is not at issue in this case. Doc. 197-20 at 63:8-18. Plaintiff does not provide support for his statement that this issue was inconsequential to the result in *Andreu*.

The additional argument in *Andreu* is sufficient to make the issue in that case different from the issue in this case, so as to render offensive collateral estoppel inapplicable. The Court cannot determine that the additional issue of WP of Florida's purported failure to pay for extra shifts did not affect the jury's decision in *Andreu*. For this reason, the Court finds that application of offensive collateral estoppel would be unfair in this case. Accordingly, it is

47

**ORDERED**:

1.      Defendant Waste Pro USA, Inc.'s Motion for Summary Judgment (Doc. 185) is **DENIED.**  Genuine issues of material fact exist as to whether Waste Pro USA is a joint employer of Plaintiff and Helpers.

2.      Defendant Waste Pro of Florida, Inc.'s Motion for Summary Judgment (Doc. 187) is **GRANTED-in-part and DENIED-in-part**.  Defendant WP Florida's practice of paying bonuses and including them in the regular rate, for which Defendant paid half time as overtime, did not violate the FLSA.  Thus, Defendant WP Florida's Motion for Summary Judgment is **GRANTED** with respect to its practice of including payment of bonuses in calculating day workers' regular rate.  Additionally, the Court finds that Defendant WP Florida's practice of paying a day rate, half day rate based on tasks, and bonuses does not violate the FLSA as a matter of law to the extent that payment of a day rate and half day rate was not tied to the number of hours worked.  This conclusion also applies with respect to Defendant WP USA.  However, because a genuine issue of material fact exists as to whether a half day rate was paid for daily tasks if the employee worked fewer than four hours, Defendant WP Florida's Motion for Summary Judgment is **DENIED** with respect to whether payment of a half day rate complied with the FLSA.

3.      Plaintiff's Amended Motion for Partial Summary Judgment (Doc. 197) is **DENIED.**

**DONE AND ORDERED** in Tampa, Florida on September 30, 2019.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any